IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN R. BEARD, | ) | CASE NO. 5:13-cv-01704 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jonathan R. Beard ("Plaintiff" or "Beard") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").

Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been

referred to the undersigned Magistrate Judge for a Report and Recommendation. Doc. 18.

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

On or about July 12, 2010, Beard filed applications for DIB and SSI.  Tr. 74, 86, 98, 99,

100, 113, 126, 127, 169.  Beard initially alleged a disability onset date of July 15, 2008.  Tr. 74,

86, 169.  On March 12, 2012, during the administrative hearing, while on the record and

represented by counsel, Beard amended his alleged onset date to March 4, 2010.  Tr. 14, 44, 48-

49, 168.  He alleged disability based on early stages of Parkinson, epilepsy, and learning

difficulties.  Tr. 74, 86, 98, 99, 126, 127, 128, 132, 136, 139.  After initial denial by the state

agency (Tr. 98-99, 128-134), and denial upon reconsideration (Tr. 126-127, 136-141), Beard requested a hearing (Tr. 142).  An administrative hearing was held before Administrative Law Judge James A. Hill ("ALJ") on March 12, 2012.[1]  Tr. 36-73.

In his March 20, 2012, decision, the ALJ determined that Beard had not been under a disability from March 4, 2010, through the date of the ALJ's decision.  Tr.14-27.  Beard requested review of the ALJ's decision by the Appeals Council.  Tr. 6-10.  On June 11, 2013, the Appeals Council denied Beard's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal and vocational evidence

Beard was born in 1962 and was 49 years old at the time of the hearing.  Tr. 46, 169.  At the time of the hearing, Beard was separated.  Tr. 47.  He lived with his step-daughter.[2]  Tr. 57.  Beard finished school through the eighth grade and indicated that he was placed in special education classes after he had failed a class.  Tr. 47-48.  He has a limited ability to read and write in English.  Tr. 48.  On March 4, 2010, while Beard was working, he had a seizure that caused him to be taken to the hospital.  Tr. 44-45, 62-63, 281-283.  Beard has not worked since March 4, 2010.[3]  Tr. 49.

---

[1] During the administrative hearing, the ALJ noted that Beard had previously applied for social security disability and that, in a decision dated September 5, 2007, Beard was awarded benefits for a closed period of September 2004 to November 2005. Tr. 42. However, the basis for the award of benefits is unclear.

[2] Beard's step-daughter was previously married to his brother.  Tr. 57.  Thus, he also referred to her as his sister-in-law.  Tr. 57.

[3] During the administrative hearing, counsel for Plaintiff indicated that, on March 4, 2010, Plaintiff had been working for a company that he had previously worked for in 2009.  Tr. 44-45.  As of March 4, 2010, Plaintiff was working for that company only on an as-needed basis.  Tr. 44-45.  March 4, 2010, was the only day in 2010 that Plaintiff had worked for that company.  Tr. 44-45. A June 16, 2010, treatment note reflects that Beard reported that he was working part-time.  Tr. 295.

Beard has worked in the past as a diesel mechanic, which included maintaining and changing oil, changing alternators and starters and generally working to fix trucks and tires.  Tr. 49.  He also worked as a night security guard, which involved guarding a warehouse to make sure that there were no fires.[4]  Tr. 50.

## B.    Medical evidence

### 1.    Conditions and treatment

Beard alleges that his physical and mental impairments cause limitations of such severity that he is unable to perform any work.  The following is a summary of Beard's treatment for his physical impairments.[5]

As noted above, on March 4, 2010, Beard lost consciousness and experienced upper extremity weakness and numbness while at work. Tr. 283.  He was taken to the hospital where it was suspected that Beard had experienced a seizure.  Tr. 274-275, 281-283.  A CT head scan was performed, which showed no acute intracranial abnormality but did show a small calcification along the left optic nerve sheath complex with mild mass effect.  Tr. 276, 280.  The calcification was not shown on an MRI.  Tr. 276.  He had a normal EEG, showing no evidence of seizure activity.  Tr. 276, 278.  On March 6, 2010, Beard was discharged.  Tr. 276-277.  He was advised to follow up with neurology in four weeks and not drive until advised by neurology that he could.  Tr. 276.  His diagnoses on discharge included "new onset recurrent focal seizures involving the right hemisphere."  Tr. 276.  Later that same day, Beard returned to the hospital with complaints of another seizure.  Tr. 274.  The attending physician observed Beard having a

---

[4] For one of his security job positions, he was authorized to carry a firearm.  Tr. 50.

[5] To demonstrate the severity of his mental impairment, Beard relies primarily on IQ test scores obtained during Mr. Mohler's consultative examination (Tr. 327-328), limited school records that show failing grades and that reflect Beard's failure to complete school beyond the ninth grade (Tr. 265-267), and Mr. Mohler's opinions of marked limitations (Tr. 325-330).

seizure while in the emergency room. Tr. 274. The seizure lasted about a minute and thereafter he was awake, alert and acting appropriately. Tr. 274. He was not admitted but his medication dosage was increased. Tr. 274-275.

On March 9, 2010, Beard saw James R. Bavis, Jr., M.D., of the NeuroCare Center, for a consultation with respect to his recent onset of seizures. Tr. 299-300. Beard reported that he had no history of trauma and no prior history of seizures. Tr. 299. Beard also indicated that, aside from having some problems with "being slow" when he was younger, neurologically he had no known history of anything unusual. Tr. 299. On examination, Beard was "alert and oriented with no speech or language deficit." Tr. 300. His "[m]emory, attention span/concentration, language and fund of knowledge were examined and were unremarkable." Tr. 300. He had "[n]ormal tone, bulk, and strength x 4 extremities." Tr. 300. His deep tendon reflexes were "equal, symmetric, and nonpathologic." Tr. 300. Beard had "dysmetria[6] that was mild in the bilateral upper extremities" and "some very mild ataxia[7] on walking, and felt very unsteady on turns." Tr. 300. Beard indicated that he was unable to get up without the use of his arms. Tr. 300. However, Dr. Bavis noted that Beard's effort was lacking. Tr. 300. Dr. Bavis diagnosed "complex focal epilepsy and simple focal epilepsy emanating from the right frontal lobe" and recommended starting Beard on seizure medication that he could afford and continue with without being ataxic. Tr. 300.

Beard saw Dr. Bavis again on March 26, 2010. Tr. 297-298. He reported that he had been doing well except that, over the prior four days, he had been having spasms in his left hand and arm. Tr. 297. The spasms usually occurred while Beard was doing something. Tr. 297.

---

[6] Dysmetria is "a condition in which there is improper estimation of distance in muscular acts, with disturbance of the power to control the range of muscular movement, often resulting in overreaching." *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 586.

[7] Ataxia is "failure of muscular coordination; irregularity of muscular action." *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 172.

4

However, he also experienced spasms when he was not doing anything.  Tr. 297.  Dr. Bavis observed Beard having one of the hand spasms that Beard described.  Tr. 297.  Dr. Bavis noted that it looked more like movements of the thumb and index finger rather than a true muscle spasm.  Tr. 297.  Dr. Bavis indicated that Beard's "[m]emory, attention span/concentration, language and fund of knowledge were examined and were unchanged since [the] prior exam."  Tr. 297.  Dr. Bavis concluded that, while Beard's medication was keeping him from having complex focal epilepsy, Dr. Bavis was of the opinion that Beard was having breakthrough seizures that were not causing loss of consciousness.  Tr. 297.  He advised Beard not to drive and he increased Beard's medication.  Tr. 297.

Beard saw Dr. Bavis again on June 16, 2010 (Tr. 295-296) and on July 2, 2010 (Tr. 293-294).  On July 2, 2010, Dr. Bavis noted a "very mild postural tremor" and that Beard had some difficulty getting into a standing positions.  Tr. 293.  When checking the tone, bulk and strength in Beard's four limbs, Dr. Bavis detected a "bit more increased tone on the left side than the right."  Tr. 293.  There were no speech or language deficits and Beard was alert and oriented.  Tr. 293, 295.  On July 2, 2010, Dr. Bavis concluded that Beard had mild Parkinson's Disease but Beard's epilepsy should be the primary focus of his treatment.  Tr. 294.  Dr. Bavis indicated that Beard had not had any new seizures for a couple of weeks.  Tr. 294.  Beard was on a higher dose of medication and Dr. Bavis's goal was to try to reduce that level and get Beard's epilepsy under control.  Tr. 294.  He provided Beard with a prescription for Parkinson's because it was bothering Beard.  Tr. 294.  However, Dr. Bavis noted that he provided Beard with a lower cost prescription because he wanted to make sure that Beard could continue to afford his epilepsy medication.  Tr. 294.

On August 11, 2010, Beard saw Angela M. Salvino, PA-C, of the NeuroCare Center.  Tr. 354-355.  She indicated that Beard's seizures were stable on his current medication.  Tr. 355.  Beard had stopped the Parkinson's medication that Dr. Bavis had previously prescribed because Beard had reported that his tremors had increased and his gait was more unstable.  Tr. 354.  Ms. Salvino provided Beard with a prescription for a different medication to treat his Parkinson's.  Tr. 355.  She advised Beard to follow up with Dr. Bavis.  Tr. 355.  On October 19, 2010, Beard saw Dr. Bavis again.  Tr. 344.  Beard reported that his tremors were gone but he was having episodes where he gets weak in the knees and, on occasion, he has fallen.  Tr. 344.  Dr. Bavis opined that Beard's epilepsy was under control and that the "weak in the knees" episodes were autonomic dysfunction associated with Beard's Parkinson's Disease.  Tr. 345.  Dr. Bavis recommended that Beard continue with his current Parkinson's medication and epilepsy medication.  Tr. 345.

On March 4, 2011, Beard presented to the emergency room with complaints of blurred/double vision.  Tr. 373-376.  Beard reported that his vision problems had been going on for about a year but were more severe that day.  Tr. 373, 375.  He was evaluated and a CT scan was ordered.  Tr. 373-376.  The CT scan of the brain was normal and the calcification was unchanged since 2010.  Tr. 376.  Beard was discharged and instructed to return if his condition worsened.  Tr. 376.

On March 29, 2011, Beard again presented to the emergency room.  Tr. 379.  He complained that his hand/arm was shaking.  Tr. 379.  Beard reported that he had some blurry vision and lightheadedness before he started shaking but he did not lose consciousness.  Tr. 379.  The shaking had started in his right arm, spread through his body and then stopped in his body but continued in his right arm.  Tr. 379.  On examination, it was noted that Beard had no memory

deficits and no problems with concentration.  Tr. 381.  The emergency room physician

concluded that Beard had Dilantin toxicity which could have been attributed to his recent use of

antibiotics.  Tr. 381.  They also opined that the hand tremor could have been related to the

Dilantin toxicity or a partial seizure.  Tr. 381.  Beard was admitted for observation and testing.

Tr. 381.

On June 24, 2011, Beard saw Dr. Bavis.  Tr. 401-402.  Beard reported dizziness and

blurred vision.  Tr. 401.  Dr. Bavis noted the he was unaware that Beard on been put back on

Dilantin and unaware that he had been in the hospital with Dilantin toxicity.  Tr. 401.  Dr. Bavis

noted that Beard's gait had remained unchanged since the last exam but indicated that Beard had

a tendency to shuffle and to stoop and not swing his arms very well.  Tr. 401.  Dr. Bavis

instructed Beard to only take the Carbamazepine and to stop the Dilantin.  Tr. 401.  Dr. Bavis

indicated that an EEG would be obtained to determine what was happening with his seizures

because Beard was reporting loss of consciousness episodes and frequent falls.  Tr. 401.  Also,

Dr. Bavis stated that an MRI would be obtained to address Beard's ataxia, frequent falls and gait

disorder.  Tr. 401.

Beard followed up with Dr. Bavis on August 22, 2011.  Tr. 403-404.  Beard's EEG was

normal.  Tr. 403.  An EMG nerve conduction study revealed moderately severe carpal tunnel

syndrome in the left hand and an electronystagmogram was positive for left peripheral vestibular

dysfunction.  Tr. 403.  Dr. Bavis diagnosed vertigo for which Dr. Bavis recommended physical

therapy; carpal tunnel syndrome;[8] leg numbness and pain;[9] and possible Parkinson's Disease.[10]

Tr. 403-404.

---

[8] Beard indicated that he was not interested in an orthopedic surgeon referral.  Tr. 404.

[9] Dr. Bavis was going to proceed with an x-ray and EMG nerve conduction study of the legs.  Tr. 404.

At the end of 2011 and in 2012, Beard saw Dr. Joseph P. Thomas, M.D., and Dr. Steven E. Ochs, M.D.  Tr. 244-259.  They treated Beard for issues relating to his prostate.  Tr. 244-259.

Beard saw Dr. Bavis on February 13, 2012.  Tr. 493-494.  Dr. Bavis noted that Beard had not started physical therapy for his vertigo and noted that they would try again.[11]  Tr.  493.

### 2.  Medical opinion evidence

#### a.  Mental impairments

##### i.  Consultative examining psychologist

On October 7, 2010, psychologist William E. Mohler, M.A., saw Beard for a consultative evaluation and he completed a report.  Tr. 325-330.  As part of his evaluation, Mr. Mohler administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV).  Tr. 327-328.  The results included a Verbal Comprehension score of 63; a Working Memory score of 66; and a Full Scale score of 65.  Tr. 328.  Mr. Mohler concluded that the Verbal Comprehension and Working Memory scores fell within the impaired range and the Full Scale score fell within the 1st percentile and in the mildly mentally retarded range.  Tr. 328.  Mr. Mohler's summary and conclusions included his opinion that Beard was a 48-year-old with "apparently retarded intellectual skills."  Tr. 328.  Mr. Mohler further opined that, "In considering his education and more specifically his job history, it appears that the current level of intellectual functioning is the result of deterioration secondary to seizures and/or Parkinson's Disease.  The deterioration has significantly affected memory."  Tr. 328.  Mr. Mohler's diagnoses included Cognitive Disorder

---

[10] Dr. Bavis continued Beard on his Parkinson's medication.  Tr. 404.

[11] Beard saw Dr. Bavis again on April 16, 2012, and continued to see Dr. Bavis through October 15, 2012.  Tr. 477-479, 481, 483-487, 489-490.  However, those records post-date the ALJ's March 20, 2012, decision and therefore are not discussed herein.

NOS with a GAF score of 50.[12]  Tr. 328.   In assessing a GAF score of 50, Mr. Mohler noted

that Beard's functional severity rating was in the serious impairment range as a result of his

current intellectual functioning being in the retarded range.  Tr. 328.

With respect to Beard's work related mental abilities, Mr. Mohler opined that:

1. The claimant's mental ability to relate to others, including fellow workers and supervisors is markedly impaired by his attention problems, memory problems and overall intellectual limitations.  He would have difficulty at this point relating sufficiently to coworkers and supervisors for even simple repetitive tasks.

2. The claimant's mental ability to understand, remember and follow instruction is markedly impaired.  Memory deficits are fairly severe.

3. The claimant's mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks is moderately impaired.  He demonstrates fairly significant problems with both attention span and distractibility.

4. The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activity is markedly impaired.  His limited intellectual skills, serious memory problems and attending difficulties would substantially reduce his wherewithal to deal with additional stressors.

Tr. 328-329.

### ii. Reviewing psychologists

On November 5, 2010, state agency reviewing psychologist Steven J. Meyer, Ph.D.,

completed a Psychiatric Review Technique (Tr. 78-79) and a Mental RFC Assessment (Tr. 80-

83).

---

[12] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

In the Psychiatric Review Technique, Dr. Meyer assessed Beard's mental impairment under Listing 12.02 – Organic Mental Disorders – and concluded that Beard did not satisfy a Listing.  Tr. 78.  In reaching his conclusion, Dr. Meyer opined that Beard had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 78.  There were no episodes of decompensation of extended duration.[13]   Tr. 78.

In the Mental RFC Assessment, Dr. Meyer offered his opinion with respect to Beard's abilities in 20 categories.  In the area of "understanding and memory," Dr. Meyer opined that Beard was moderately limited in his ability to understand and remember very short and simple instructions and in his ability to understand and remember detailed instructions.  Tr. 81.  Dr. Meyer found that Beard was not significantly limited in his ability to remember locations and work-like procedures.  Tr. 81.

In the area of "sustained concentration and persistence," Dr. Meyer opined that Beard was moderately limited in his ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 81.  He found Beard was not significantly limited in his ability to carry out very short and simple instructions.  Tr. 81.  He also opined that there was no evidence of limitation in Beard's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in

---

[13] During the reconsideration of Beard's claim, on May 25, 2011, state agency reviewing psychologist Karla Voyten, Ph.D., offered a similar opinion.  Tr. 106-107.

coordination with or in proximity to others without being distracted by them; and ability to make simple work-related decisions.  Tr. 81.

In the area of "social interaction," Dr. Meyer opined that Beard was moderately limited in his ability to interact with the general public.  Tr. 82.  He also found no evidence of limitation in Beard's ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Tr. 82.

In the area of "adaptation," Dr. Meyer opined that Beard was moderately limited in his ability to respond appropriately to changes in the work setting.  Tr. 82.  He also found no evidence of limitation in Beard's ability to be aware of hazards and take appropriate precautions; ability to travel in unfamiliar places or take public transportation; and ability to set realistic goals or make plans independently of others.  Tr. 82.

In reaching his conclusions, Dr. Meyer noted that Beard scores in the borderline range, which Dr. Meyer opined was "roughly consistent with education."  Tr. 82.  He gave less weight to Mr. Mohler's opinions because Dr. Meyer found that Beard's presentation at the consultative evaluation was not consistent with medical evidence in the file such as normal mental status examinations reflected in his neurological treating source's notes.  Tr. 79, 82.  Dr. Meyer stated that Mr. Mohler's opinion was an overestimate of the severity of Beard's restrictions/limitations and was based only on a snapshot of Beard's functioning.  Tr. 83.  Dr. Meyer concluded that Beard was "[c]apable of simple and moderately complex routine work, within any physical conditions, in setting with regular expectations, occasional intermittent interactions with others and few changes."  Tr. 82.

### b.  Physical impairments

### i.  Consultative examining physician

On May 11, 2011, Chimezie C. Amanambu, M.D., M.P.H., conducted a consultative physical evaluation.  Tr. 389-396.  Dr. Amanambu noted that Beard had been diagnosed with epileptic disorder and Parkinson's disease in or around 2009.  Tr. 393.  Beard reported having seizures two to three times each week, with falls occurring sometimes.  Tr. 393.  Beard reported that he is always with someone because of the possibility of a fall.  Tr. 393.  In the past, he had sustained injuries to his upper extremities and scalp.  Tr. 393.  There is nothing specific that triggers one of his seizures.  Tr. 393.  He loses consciousness and is confused after the occurrence of a seizure.  Tr. 393.  Beard indicated that his tremors are primarily in his right upper extremity and involved dizziness and an inability to move his arm.  Tr. 393.  Beard stated that he resided with a friend and was capable of taking care of his activities of daily living.  Tr. 393.

Dr. Amanambu's physical examination of Beard revealed normal results, including normal reflexes, gait and strength.  Tr. 389-392, 394.  Dr. Amanambu's clinical diagnoses included Parkinson's Disease and Epilepsy.  Tr. 394.  With respect to Beard's ability to perform work-related activities, Dr. Amanambu opined that:

> Mr. Beard can sit.  He can stand, walk, kneel, bend, twist, and crawl.  He can carry, lift, and reach.  His speech and hearing are not affected.  However, he is at risk for fall and injury at the work place because of his epileptic seizures.  He is unable to perform work at the present time because he is at risk of injury.  His work limitations are as follows: He can do less than sedentary work.

Tr. 395.

### ii.   Reviewing physicians

On November 10, 2010, state agency reviewing physician Elizabeth Das, M.D., completed a physical RFC.  Tr. 79-80.  She opined that Beard had the following limitations: he could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl.  Tr. 79-80.  In offering her opinions, Dr. Das noted that, because of Beard's Parkinson's, he has some balance problems and should avoid climbing ladders or ropes.  Tr. 80.  She also noted that, since Beard has problems standing from a seated position, he would have significant problems standing from a crouching position.  Tr. 80.  No environmental limitations were noted.  Tr. 80.

On May 24, 2011, as part of the reconsideration of Beard's claim, state agency reviewing physician W. Jerry McCloud, M.D., also completed a physical RFC.  Tr. 108-110.  His assessment was the same as Dr. Das's assessment with the exception of an additional environmental limitation.  Tr. 109-110.  More particularly, because of Beard's seizures, Dr. McCloud opined that Beard would be required to avoid all exposure to hazards such as machinery and heights.  Tr. 110.  Also, since Dr. McCloud's review post-dated Dr. Amanambu's consultative evaluation, Dr. McCloud had the opportunity to review Dr. Amanambu's opinion.  Tr. 110.   Dr. McCloud concluded that Dr. Amanambu's opinion was "without substantial support from other evidence of record, which renders it less persuasive."  Tr. 110.

## C.     Testimonial evidence

### 1.        Plaintiff's testimony

Beard testified at the administrative hearing.  Tr. 46-65.   He discussed his seizure disorder and explained that, when he has a seizure, he loses consciousness.[14]  Tr. 52.  He estimated having a seizure once every three to four weeks.  Tr. 53.  His ability to drive is limited because of his seizure disorder.  Tr. 47.   Aside from seizures, there are instances when Beard's legs have given out on him and he has fallen down.  Tr. 64.  Beard has Parkinson's disease which causes his hands to shake so bad that he cannot write. Tr. 53-54.  He also has carpal tunnel syndrome in his left arm.  Tr. 54.  Because of his carpal tunnel syndrome, he is unable to grab things and his arm locks up sometimes.  Tr. 54.  His right hand is stronger than his left hand, but he has difficulty using his right hand if it starts shaking.  Tr.  57.  He had recently had surgery for prostate cancer.  Tr. 51.  He has problems hearing and has dizzy spells approximately twice a week.  Tr. 54-55.

Beard can stand for about one hour at a time before his legs start to hurt and he has to sit down.  Tr. 55.  He can walk about two blocks.  Tr. 56.   He can sit for an hour or two at a time. Tr. 57.

He cooks for himself and tries to do his own laundry.  Tr. 57.  He goes grocery shopping with his step-daughter.  Tr. 57.   During the day, he watches television.  Tr. 58.  He has a hard time explaining to someone else what happened in a show or a movie.  Tr. 64-65.  He tries to get out every day.  Tr. 58.

---

[14] The ALJ noted that there was a statement from Beard's step-granddaughter in the record regarding his seizures (Tr. 226-227) and that, based on that statement, it did not appear that Beard lost consciousness when he had a seizure (Tr. 52-53).

## 2.    Vocational expert's testimony

Vocational Expert Lynn Smith ("VE") testified at the hearing.  Tr. 65-72.  The VE

described Beard's work experience as including work as: (1) a security guard, a light, semi-

skilled position; and (2) a mechanic, a medium, skilled position.[15]

The ALJ asked the VE to:

> [A]ssume a younger individual with a marginal education and claimant's work
> history, [who] can perform light work, but cannot climb ladders, ropes, or
> scaffolds and can occasionally climb ramps and stairs.  Assume that this person
> can occasionally balance, stoop, kneel, crouch, or crawl.  Assume this person
> must avoid all exposure to dangerous machinery and unprotected heights.
> Assume this person can understand, remember, and carry out simple instructions
> and perform simple and routine tasks.  Assume this person requires a low-stress
> workplace without strict quotas or past-paced [sic] high production demands.
> Assume this person can occasionally interact with the public and co-workers,
> provided he is not required to engage in transactional activities, such as sales,
> negotiation, arbitration, and is not subjected to potentially confrontational
> situations.

Tr. 69.

The VE indicated that the described individual would be unable to perform any of

Beard's past work.  Tr. 69.  However, the VE indicated that there were other jobs in the regional

and national economies that the described individual could perform, including: (1) cleaner of

offices, a light, unskilled position, with approximately 2,200 jobs available locally, 28,000

statewide, and 880,000 nationwide; (2) cafeteria attendant, a light, unskilled position, with

approximately 1,500 jobs available locally, 16,000 statewide, and 400,000 nationwide; and (3)

laundry worker, a light, unskilled position, with approximately 2,500 jobs available locally,

30,000 statewide, and 900,000 nationwide.  Tr. 70.

---

[15] The VE stated that the Plaintiff performed the mechanic position at a heavy, semi-skilled level.  Tr. 67-68.  In
offering her opinion, the VE took into consideration the fact that Plaintiff performed very basic tasks on vehicles
that would not necessarily require the use of a computer or reading.  Tr. 68.

In a second hypothetical, the ALJ asked the VE to assume the same restrictions as contained in the first hypothetical except that the described individual would be limited to sedentary rather than light work.  Tr. 70.  With that change, the VE indicated that there were still other jobs available in the regional and national economies that the described individual could perform, including: (1) inspector, a sedentary, unskilled position, with approximately 3,500 jobs available locally, 30,000 statewide, and 670,000 nationwide; (2) ticket checker, a sedentary, unskilled position, with approximately 7,000 jobs available locally, 70,000 statewide, and 1.8 million nationwide; and (3) polisher, a sedentary, unskilled position, with approximately 3,600 jobs available locally, 10,000 statewide, and 100,000 nationwide.  Tr. 70-71.

In a third hypothetical, the ALJ asked the VE to assume the individual described in the second hypothetical except that: the individual can understand but cannot consistently remember and carry out simple instructions and can only occasionally perform fine and gross manipulation, fingering and handling because of tremors.  Tr. 71.  In response, the VE indicated that there would be no jobs available to the third described individual.  Tr. 71.  In response to a question from Beard's counsel, the VE indicated that her answer in response to the third hypothetical would not change if the individual could not consistently remember and carry out simple instructions but did not have the additional limitations with respect to upper extremities.  Tr. 71-72.

Beard's counsel also asked the VE whether adding to the ALJ's first hypothetical a limitation of being off-task 15% or more of the time because of intellectual limitations would change her response.  Tr. 72.  The VE indicated that, with that additional limitation, the described individual would be unable to sustain the positions that the VE identified.  Tr. 72.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[16] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 20, 2012, decision, the ALJ found that:[17]

1.  Beard meets the insured status requirements through December 31, 2014. Tr. 16.

2.  Beard has not engaged in substantial gainful activity since March 4, 2010, the amended alleged onset date.  Tr. 16.

3.  Beard has the following severe impairments: seizure disorder, early onset Parkinson's disease and cognitive disorder.  Tr. 16.  All other impairments, including malignant neoplasm of prostate status post resection, vertigo, diplopia, left vestibular lesion, mild restrictive lung disease, and carpal tunnel syndrome are non-severe.  Tr. 16-17.

4.  Beard does not have an impairment or combination of impairments that meets or medically equals a listed impairment,[18] including Listings 11.02A & B – Epilepsy (convulsive epilepsy), 11.03 – Epilepsy (nonconvulsive epilepsy), 11.06 – Parkinsonian syndrome, and 11.14 – Peripheral neuropathies, 12.02 – Organic mental disorders.  Tr. 17-19.

---

[16] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[17] The ALJ's findings are summarized.

[18] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

5. Beard has the RFC to perform light work except he cannot climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs.  He can occasionally balance, stoop, kneel, crouch and crawl.  He must avoid all exposure to dangerous machinery and unprotected heights.  He can understand, remember and carry out simple instructions and perform simple, routine tasks.  He requires a low stress workplace without strict quotas or fast-paced high production demands.  He can occasionally interact with the public and coworkers provided he is not required to engage in transactional activities such as sales, negotiation and arbitration and he is not subjected to potentially confrontational situations.  Tr. 19-25.

6. Beard is unable to perform any past relevant work.  Tr. 25.

7. Beard was born in 1962 and was 46 years old, defined as a younger individual age 18-49, on the amended alleged disability onset date.  Tr. 25.

8. Beard has a marginal education and is able to communicate in English.  Tr. 25.

9. Transferability of job skills is not material to the determination of disability.  Tr. 25.

10. Considering Beard's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Beard can perform, including cleaner of offices, cafeteria attendant, and laundry worker.  Tr. 25-26.

Based on the foregoing, the ALJ determined that Beard had not been under a disability from March 4, 2010, through the date of the decision.  Tr. 26.

## V. Parties' Arguments

### A. Plaintiff's arguments

Beard asserts that the ALJ erred by finding that he did not meet Listing 12.05C – Mental Retardation and/or by failing to discuss Listing 12.05C at Step Three.   Doc. 15, pp. 8-18.  Beard argues that evidence of IQ scores below 71, extremely limited education and attendance at special education classes, and his Parkinson's disease and seizure disorder are sufficient to

satisfy Listing 12.05C.  Doc. 16, pp. 9-15; Doc. 17, pp. 1-4.  Beard asserts that the ALJ improperly invalidated his IQ scores.  Doc. 16, pp. 9-15.  Beard also argues that, even if the Court were to conclude that Beard does not meet Listing 12.05C, since the ALJ did not provide an analysis with respect to Listing 12.05C, the Court cannot affirm the Commissioner's decision because to do so would require the Court to accept the Commissioner's post hoc rationalization.  Doc. 15, pp. 14-18.

Beard also asserts that the ALJ's assessment of his RFC is not supported by substantial evidence.  Doc. 15, pp. 18-20.  He argues that, in assessing his RFC, the ALJ misinterpreted facts in the record, including the ALJ's conclusion that Beard and James Fisher, a former employer, were friends and therefore Mr. Fisher could not be considered a disinterested third party,[19] and improperly relied on the fact that Beard drives.  Doc. 15, pp. 18-19.   Additionally, Beard argues that the ALJ's rejection of the opinions of psychological consultative examiner Mr. Mohler and physical consultative examiner Dr. Amanambu and his failure to include limitations from those opinions in the RFC were not supported by substantial evidence.  Doc. 15, pp. 19-20.

**B.** **Defendant's arguments**

The Commissioner asserts that the ALJ's decision that Beard does not meet or equal Listing 12.05C is supported by substantial evidence.  Doc. 16, pp. 10-16.  The Commissioner argues that Beard cannot demonstrate that he meets or equals Listing 12.05C because he has not satisfied the introductory paragraph of the Listing and he does not have a valid IQ score below 71.  Doc. 16, pp. 13-16.

In response to Beard's RFC argument, the Commissioner asserts that substantial evidence supports the ALJ's RFC assessment and evaluation of the medical source opinion evidence.

---

[19] Mr. Fisher submitted a letter dated June 20, 2011. Tr. 442.  The ALJ considered the letter as part of his decision. Tr. 24.

Doc. 16, pp. 16-21.  The Commissioner argues that the ALJ properly considered the evidence when assessing Beard's RFC, including the opinion evidence, evidence of Beard's daily activities and the lay witness statement from James Fisher.  Doc. 16, pp. 16-21.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20*03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 19*92) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 19*89).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19*84).

## A.    Substantial evidence supports the ALJ's determination that Beard does not meet or equal Listing 12.05C

Beard claims that evidence establishes that he satisfies Listing 12.05C, that the ALJ improperly considered that evidence when he invalidated Listing level IQ scores, and/or the ALJ failed to provide a detailed analysis as to why Listing 12.05C was not met.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a Listing. *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (6th Cir. 2014) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 19*87).

Listing 12.05 relates to mental retardation.[20] To qualify as disabled under that Listing, a claimant needs to satisfy both the diagnostic description in the introductory paragraph of Listing 12.05 and one of the four sets of criteria found in Subparts A through D. 20 C.F.R. § 404.1525(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001). The diagnostic description is as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The additional Subpart C criteria are:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C.

With respect to his alleged mental impairment, Beard alleged that he was a slow learner and/or that he had learning difficulties.  Tr. 74, 86, 128, 132, 136, 139.   He did not specifically allege mental retardation and no medical source diagnosed Beard with mental retardation.

Although the ALJ did not identify or discuss Listing 12.05C as part of his Step Three analysis, his decision makes clear that he considered all of the evidence, including the medical treatment records, opinion evidence, Beard's IQ scores, school records showing very low grades, past work history, and daily activities.  This discussion is sufficient to allow for meaningful judicial review of the Commissioner's decision that Beard did not meet a Listing, including Listing 12.05C. *See Reynolds v. Comm'r of Soc. Sec.,* 424 Fed. Appx. 411, 416 (6th Cir. April 1, 20 11)(determining that an evaluation of the evidence and explained conclusions that allow a court to engage in meaningful judicial review are necessary components of an ALJ's Step Three

---

[20] Intellectual Disability replaced the term Mental Retardation in listing 12.05(C) effective September 3, 2013. 78 FR 46499-01 (Aug. 1, 2013).

analysis); *see also Hufstetler v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 64298, *26-29 (N.D. Ohio June 17, 2011) (affirming the Commissioner's decision where the ALJ did not specifically discuss a Listing at Step Three but provided sufficient analysis at Step Four for the court to determine that no reasonable fact finder would have decided the matter differently).

In particular, with respect to Beard's alleged mental impairments, the ALJ stated:

> With respect to the mental health component of this case and for his alleged cognitive disorder, at the State consultative examination, Mr. Mohler, a licensed psychologist, found that Mr. Beard had a cognitive disorder.  He also assessed Mr. Beard's Verbal Comprehension IQ score at 63, his Working Memory IQ score at 66 and his Full Scale IQ score at 65.  The Full Scale IQ score places Mr. Beard in the first percentile and would classify his [sic] in the mildly mentally retarded range (BF7).  However, these IQ scores are in stark contrast to a person who was gainfully employed and working above substantial gainful activity levels for many years with his alleged cognitive disorder.  What is more, theses [sic] scores are not consistent with Mr. Beard's reported activities of daily living and his ability to read some news articles (Hearing).  Further, without any valid scores or probative evidence prior to his turning twenty-two years old, it is extremely difficult to find these scores valid.  Mr. Beard's representative argues that Mr. Beard's school records from 1977-1979, which show very low marks (B1F), are good evidence of Mr. Beard's "intellectual limitations" (B13E).  I find it difficult, however, to extrapolate that conclusion from grades alone without any further explanation in those records.  There are myriad reasons why one could receive low grades, including the fifty-eight days of absences noted in his eighth grade records.   As such, I find the school records to be of little probative value.  Consequently, I find the IQ scores assessed by Mr. Mohler are not valid.  To add to this conclusion, I would note that throughout the record, Mr. Beard's mental status has been regarded as normal by his neurologist on numerous occasions (B5F, B14F).  Likewise, on March 4, 2010, he denied any cognitive difficulty (B3F/12).

Tr. 21-22.

Beard argues that the ALJ's reasons for invalidating his IQ scores are insufficient and therefore the decision is not supported by substantial evidence.  Further, he argues that had the ALJ not invalidated the IQ score, he would have been found to meet Listing 12.05C because the evidence establishes onset of impairment prior to age 22 and the existence of other impairments imposing an additional and significant work-related limitation of function.

With respect to the IQ scores, in order to satisfy Listing 12.05C, a claimant's IQ score must be valid.  20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C.  Here, the ALJ listed a number of reasons for finding that Beard's IQ scores as assessed by Mr. Mohler were invalid.  In reaching his decision, the ALJ considered both medical and non-medical evidence, including medical treatment notes from Beard's own treating neurologist indicating that Beard's mental status was deemed normal, past work history which demonstrated the ability to maintain employment for many years, and daily activities.  "The regulations do not limit the question of validity [of IQ scores] to test results alone in isolation from other factors." *Albright v. Astrue*, 2011 U.S. Dist. LEXIS 117768, *29 (N.D. Ohio 2011) (citing *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 19*91)).  "In assessing the validity of a claimant's IQ, information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living, social functioning, concentration, persistence and pace; or ability to tolerate stress."  *Id. See Brooks v. Astrue*, 2010 U.S. Dist. LEXIS 27583, * 11 (N.D. Ohio 2010) (recognizing that factors outside the test itself, including daily activities and past work experiences, may be considered when determining the validity of an IQ score).  Thus, the ALJ's consideration of factors other than the test itself was not improper.

Relying on *Brown v. Sec'y of Health and Human Servs.,* 948 F.2d 268 (6th Cir. 1991), Beard argues that the ALJ's consideration of his basic abilities with respect to daily living activities was insufficient to invalidate the IQ scores.  Doc. 15, pp. 10-11.  However, *Brown* is distinguishable.  In this case, the ALJ relied not only on Beard's daily activities and experience, including his ability to sustain substantial gainful employment for many years, but also on treatment records from Beard's neurologist indicating that Beard's mental status had been regarded as normal (Tr. 21-22, 295, 297, 300, 403) and Beard's own denial of cognitive

difficulties as recently as March 4, 2010 (Tr. 22, 285).    The claimant in *Brown* completed

school only through the sixth grade.  In contrast, Beard attended school beyond sixth grade.  Tr.

265.  He completed the eighth grade and stopped attending school in the ninth grade.  Tr. 48,

265.  Although Beard received very low marks during the school years of 1977-1979 (eighth and

ninth grade), the ALJ considered the school records and found that, without further explanation

in those records, they were of little probative value.  Tr. 21-22.  For example, the ALJ noted that

those same records reflect that Beard missed 58 days of school, which he concluded could be a

reason for Beard receiving such low grades.  Tr. 21-22.  Additionally, although Beard did not

attend school beyond the ninth grade, as indicated by the ALJ, Beard maintained employment for

many years[21] and was able to learn his jobs through demonstration.[22]  Tr. 18, 21.

    Beard has failed to demonstrate that it was improper for the ALJ to consider factors other

than the test scores when determining whether those scores were valid and has failed to

demonstrate that the ALJ's reasons are not supported by substantial evidence.[23]

    Beard also asserts that Mr. Mohler, who administered the WAIS-IV, was aware of

Beard's employment history and did not invalidate the IQ scores.  Doc. 15, p. 10.  Thus, Beard

argues that the ALJ's reliance on Beard's employment history to invalidate the scores was error.

---

[21] The VE indicated that Beard's past positions were classified as or he performed them as semi-skilled positions.
Tr. 67-68.

[22] Beard acknowledges that he was able to function adequately at work but states that that changed when he started
to have seizures.  Doc. 15, p. 11.

[23] Relying on *Dragon v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 454 (6th Cir. 2012), Beard argues that, because Mr.
Mohler's full evaluation supports a finding that Beard was functioning in the mildly mentally retarded range, the
ALJ was precluded from rejecting IQ scores that may lead to a finding of disability.  Doc. 15, pp. 14-15. The ALJ
did not ignore Mr. Mohler's opinion.  He considered it and gave it little weight.  As discussed below, that decision is
supported by substantial evidence.  In *Dragon*, the ALJ's decision to disregard the examining doctor's evaluation
was determined not to be supported by substantial evidence.  *Id.* at 464.  Inasmuch as *Dragon* is distinguishable
from this case, *Dragon* does not dictate reversal and remand even if Mr. Mohler's full evaluation were deemed to
support the IQ scores.  Moreover, as discussed below, even if the IQ scores were deemed valid, Beard has failed to
demonstrate onset of his alleged impairment prior to age 22, unlike the claimant in *Dragon*.

Doc. 15, p. 10.  However, as discussed above, an ALJ is not precluded from considering factors other than the test, including past work experience.  *Brooks*, 2010 U.S. Dist. LEXIS 27583, * 11. Further, although Mr. Mohler did not invalidate Beard's IQ scores, he did not diagnose Beard with mental retardation.  Tr. 328.   As noted by the ALJ, Mr. Mohler diagnosed Beard with cognitive disorder NOS.[24]  Tr. 21.  Although the lack of a diagnosis of mental retardation may not be dispositive as to whether Listing 12.05 is satisfied, it may be relevant when considering whether an IQ score is valid.  *See Cooper v. Comm'r of Soc. Sec.*, 217 Fed Appx. 450, * 452 (6th Cir. 2007) (drawing a distinction between a diagnosis of mental retardation and borderline intellectual functioning); *see also See Brooks*, 2010 U.S. Dist. LEXIS 27583, * 17 (finding that a divergent diagnosis, while not dispositive, is relevant evidence when considering whether an IQ score is valid).

Beard also asserts that the ALJ improperly invalidated his IQ scores on the basis that there were no valid IQ scores prior to age 22.[25]  Doc. 15, pp. 11-12.   While the ALJ considered the fact that there were no IQ scores prior to Beard turning twenty-two years old, it was only one factor that he considered when invalidating the IQ scores.  Thus, reversal is not warranted based on the fact that the ALJ noted and considered the lack of IQ scores prior to age 22 when considering the severity of and the functional limitations associated with Beard's mental impairment.

---

[24] The category of Cognitive Disorder Not Otherwise Specified – 294.9 "is for disorders that are categorized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet the criteria for any of the specific deliriums, dementias, or amnestic disorders . . . and that are not better classified as Delirium Not Otherwise Specified, Dementia Not Otherwise Specified, or Amnestic Disorder Not Otherwise Specified. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 179-180.

[25] With regard to the lack of IQ scores prior to age 22, the ALJ stated "without any valid scores or probative evidence prior to his turning twenty-two years old, it is extremely difficult to find these scores valid."  Tr. 21.

Beard also asserts that the ALJ's reliance upon Beard's own neurologist's treatment notes, which reflect normal mental status, and Beard's own statement denying cognitive impairments was error because there is too much other evidence to the contrary.  Doc. 15, pp. 13-14.  In support of his argument, Beard relies in part on Mr. Mohler's opinion that Beard had marked impairments in work-related abilities.  Doc. 15, pp. 13-14.  However, as discussed below, the ALJ's decision to provide little weight to that opinion was explained and is supported by substantial evidence.  Further, even if there is other evidence to support Beard's claim that his IQ scores should be deemed valid, since there is substantial evidence to support the Commissioner's decision, it should not be overturned.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Since the ALJ's decision to invalidate Beard's IQ scores was sufficiently explained and is supported by substantial evidence and because a *valid* IQ score is required in order to satisfy Listing 12.05C, Beard's argument that the ALJ erred in not discussing Listing 12.05 as part of his Step Three analysis and/or that he erred in finding that Beard did not meet Listing 12.05C is without merit.

Even if the ALJ's decision to invalidate Beard's IQ scores was improper or not supported by substantial evidence, Beard is unable to demonstrate  deficits in adaptive functioning initially manifested during the developmental period; i.e., that the evidence demonstrates or supports onset of the impairment before age 22.   The ALJ made clear that he considered the entire record, including Beard's limited school records showing low marks.  Tr. 16-26.  For example, the ALJ concluded that the school records were of limited probative value without further explanation with respect to those records.  Tr. 21-22 (referencing B1F (Tr. 265-267) and B13E (Tr. 263-264)).  Thus, to the extent Beard relies on his school records to demonstrate onset of his

impairment prior to age 22, the ALJ already determined that those records were of limited

probative value.  Tr. 21-22.  Additionally, the ALJ also considered that Beard was able to

maintain employment for many years.  Tr. 21.  He also considered evidence of Beard's activities

of daily living and found mild restrictions.  Tr. 18.  Further, Mr. Mohler, upon whom Beard

relies heavily, stated, "it appears that the current level of intellectual functioning is the result of

deterioration secondary to seizures and/or Parkinson's Disease."  Tr. 328.  Beard's seizures were

not present prior to age 22.  Tr. 393 (indicating diagnosis of seizures in or around 2009).  Thus,

Mr. Mohler's opinion does not provide support for a finding of onset prior to age 22.

Beard also argues that remand is necessary because the ALJ did not fully analyze his

impairment under Listing 12.05C.[26]  However, when considered as a whole, the ALJ's decision

makes sufficiently clear that the ALJ considered the evidence but determined that Beard does not

satisfy Listing 12.05C and that decision is supported by substantial evidence.  Further, Beard has

failed to demonstrate how he satisfies all the requirements of Listing 12.05C, including the

diagnostic description.  "No principle of administrative law or common sense requires us to

remand a case in quest of a perfect opinion unless there is reason to believe that the remand

might lead to a different result."  *Todd v. Astrue*, 2012 WL 2576435, *10 (N.D. Ohio 2012)

(internal citations omitted), *report and recommendation adopted*, 2012 WL 2576282 (N.D. Ohio

2012) (quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)).  Thus, since Beard has

not demonstrated that remand for further articulation at Step Three is likely to lead to a different

result, remand is not warranted.  *See Todd*, 2012 WL 2576435, *10 (declining to remand for a

more complete Step Three analysis where the claimant had not provided an adequate basis to

---

[26] Beard additionally argues that the ALJ should have contacted Mr. Mohler to determine whether he believed the IQ scores were valid or invalid.  Doc. 15, p. 15.  Because substantial evidence supports the ALJ's decision, reversal and remand is not required for further development of the record.

find that remand for a more fully explained Step Three analysis might result in a different outcome).

For the reasons set forth herein, Beard's arguments with respect to Listing 12.05 are without merit.

**B.      The ALJ's RFC determination is supported by substantial evidence**

Beard challenges the ALJ's RFC assessment and argues that the ALJ improperly discounted the opinions of the consultative examiners, Mr. Mohler and Dr. Amanambu; the ALJ incorrectly considered the statement from Mr. Fisher, Beard's former employer; and the ALJ gave too much consideration to statements that Beard is able to drive.  Doc. 15, pp. 18-21.

**1.    The ALJ's consideration of the medical opinion evidence was proper**

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  20 C.F.R. § 404.1527(e)(2).  Those factors include the examining and/or treatment relationship, length, nature and extent of treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization. 20 C.F.R. § 404.1527(c)(1)-(6).

Federal regulations establish the hierarchy of medical opinion evidence.  At the top of the hierarchy are opinions provided by the claimant's treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). Opinions from these sources are entitled to controlling weight so long as the opinion is well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson*, 378 F.3d at 544.  Next in the hierarchy are opinions issued by examining physicians. 20 C.F.R. § 404.1527(c).  Finally, the adjudicator must consider the findings of non-examining physicians. 20 C.F.R. § 404.1527(e).

Opinions from non-examining physicians are not entitled to any special degree of deference. *Id.* However, the regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, as these individuals are "highly qualified" and are "experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i).

### a.  Mr. Mohler

With respect to Mr. Mohler's opinion, the ALJ stated:

> I give the opinion of Mr. Mohler little probative weight because it is not supported by the medical evidence of record and is in direct conflict with the many reports from Dr. Bavis, Jr., that Mr. Beard's memory, attention span and concentration were unremarkable (B5F/1, 5, 8, B9F/1, B14F/1). Further, on March 29, 2011, it was noted that he had no memory deficits (B10F/8). Moreover, Mr. Mohler's limitations are not consistent with Mr. Beard's reported activities of daily living such as driving, cooking and shopping. Consequently, based on these reasons, I give this opinion little probative weight.

Tr. 23.

Mr. Mohler was a one-time examining psychologist and therefore not entitled to controlling weight. In weighing Mr. Mohler's opinion, the ALJ properly considered the fact that the opinion was not consistent with or supported by other medical evidence, including Beard's treating neurologist's records and other evidence of daily activities. 20 C.F.R. § 404.1527(c)(1)-(6). The essence of Beard's argument is that the ALJ's reasons are not valid because there is other evidence to corroborate Mr. Mohler's findings.[27] Doc. 15, pp. 14-15, 20. However, Beard has failed to show that the ALJ's reasons are not supported by substantial evidence and, even if there is other evidence to support Beard's position, since there is substantial evidence to support the Commissioner's decision, it should not be overturned. *Jones v. Comm'r of Soc. Sec.*, 336

---

[27] Beard takes issue with the ALJ's reliance on Beard's ability to drive. Doc. 15, pp. 18-19. He asserts that, while he is able to drive, he should not be driving. Doc. 15, pp. 18-19. Even if Beard's driving was limited because of his seizures, the ALJ considered evidence of other daily activities.

F.3d 469, 477 (6th Cir. 2003). Additionally, the ALJ's RFC assessment with respect to Beard's

mental impairment is supported by the opinions of state agency reviewing psychologists (Tr. 80-

83; 106-108) which the ALJ provided some weight to.[28] Tr. 24. Accordingly, Beard's challenge

to the ALJ's consideration of Mr. Mohler's opinion and the mental RFC is without merit.

### b. Dr. Amanambu

With respect to Dr. Amanambu's opinion, the ALJ stated that:

> Upon examination, his [Beard's] reflexes were normal, as was his motor strength.
> Further, his gait was normal and he had no rigidity. Based upon the examination,
> Dr. Amanambu opined that Mr. Beard is able to sit, stand, walk, kneel, bend, twist
> and crawl. In addition, he opined that he can carry, lift and reach. He further
> opined that his speech and hearing were not affected. However, Dr. Amanambu
> noted that Mr. Beard is at risk for fall and injury at the work place because of his
> epileptic seizures. As such, he is unable to perform work at the present time
> because he is at risk of injury. He thus opined that Mr. Beard can do less than
> sedentary work (B11F). I give the opinion of Dr. Amanambu little probative
> weight because it is not consistent with the record as a whole and the fact that Mr.
> Beard has responded well to his prescription medication therapy.

Tr. 24.

Like Mr. Mohler, Dr. Armanambu was a one-time examining physician and therefore his

opinion was not entitled to controlling weight. The ALJ sufficiently explained the reasons for

providing the opinion little weight and Beard fails to fully articulate how the ALJ's reasons are

unsupported by the record.[29] A review of the record demonstrates that the ALJ's decision is

supported by the record. For example, on several occasions, neurology treatment notes reflect

that Beard's seizure and Parkinson's medication was helping to keep his conditions under

control. Tr. 294, 345, 355. Additionally, Dr. Amanambu's statement that Beard was unable to

---

[28] The ALJ also took note of the fact that there were no opinions from treating physicians indicating that Beard was disabled or stating that Beard has limitations greater than those found by the ALJ. Tr. 24.

[29] "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted).

work is an issue reserved to the Commissioner and therefore not determinative of disability.  *See 20 C.F.R. § 404.1527(d)*.  Further, the ALJ's RFC with respect to Beard's physical impairments is supported by the opinions of state agency reviewing physicians (Tr. 79-80; 108-110) which the ALJ provided great weight to.  Tr. 23, 24   Accordingly, Beard's challenge to the ALJ's consideration of Dr. Amanambu's opinion and the physical RFC which restricts Beard to a limited range of light work is without merit.

### 2.   The ALJ's consideration of Mr. Fisher's lay witness statement was proper

"Other sources," like Mr. Fisher, may be used to provide insight into the severity of a claimant's impairment and how it affects his ability to function.  *See 20 C.F.R. 404.1513(d)* (indicating that evidence from other sources may be considered); *see also* SSR 06-3p, 71 FR 45593-03 (Aug. 9, 2006).  In accordance with the regulations, the ALJ considered the June 20, 2011, statement of Mr. James Fisher (Tr. 442), Beard's former employer who had witnessed Beard having a seizure and took him to the hospital and the ALJ explained the weight he provided to Mr. Fisher's statement. Tr. 24.   The ALJ stated:

> I have considered the letter from Mr. Fisher.  However, the opinion of Mr. Fisher does not establish that Mr. Beard is disabled.  In considering his opinion, I considered the probative value thereof pursuant to SSR06-3p.  By virtue of Mr. Fisher's relationship as a former employer and no doubt a friend of Mr. Beard, he cannot be considered a disinterested third party whose opinion would not tend to be colored by affection for him and a natural tendency to agree with the symptoms and limitations he alleges.  Most importantly, significant weight cannot be given to his opinion because it is not consistent with the preponderance of the opinions and observations by medical doctors in this case.

Tr. 24.

Beard's challenge to the ALJ's treatment of Mr. Fisher's statement is based on his claim that, without proper evidentiary support, the ALJ concluded that Mr. Fisher was a friend and therefore not a disinterested party.  Doc. 15, p. 18.  Even if the ALJ incorrectly concluded that

Mr. Fisher was a friend of Mr. Beard's, the ALJ provided other reasons for not providing significant weight to Mr. Fisher's statement.  Moreover, statements from "other sources" are not entitled to any particular weight and the ALJ correctly determined that Mr. Fisher's statement that Beard is unable to work does not establish that Beard is disabled.  *See* 20 C.F.R. § 404.1527(d); 20 C.F.R. 404.1513(d).

Accordingly, Beard's challenge to the ALJ's consideration of Mr. Fisher's statement is without merit.

### VII. Conclusion and Recommendation

For the foregoing reasons, the Commissioner's decision should be **AFFIRMED**.

Dated:  May 6, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).